```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT
```

UNITED STATES OF AMERICA         :
                                 :
                                 :    Case No. 2:11-cr-122
         v.                      :
                                 :
                                 :
BRITNEY HALL,                    :
                                 :
              Defendant.         :

**Memorandum Opinion & Order:**
**Defendant's Motion to Suppress**

Defendant Britney Hall was indicted on one count of conspiring to distribute cocaine base and heroin with her former co-defendant, William James Dunn, in violation of 21 U.S.C. §§ 841(a)(1), 846. ECF No. 14. Before the Court is Ms. Hall's motion to suppress statements and physical evidence obtained as the fruits of an illegal arrest. ECF No. 60. Since the Court finds Hall's arrest was supported by probable cause, it **denies** the motion.

**Background**

The facts recounted below are taken from the testimony adduced and exhibits introduced at the June 11, 2012 evidentiary hearing on Hall's motion. At the hearing, the government presented two witnesses: Karl Gardner, a Vermont State Police officer assigned to the DEA as a drug task force agent ("TFA"),

and Dennis Smith, a Pawtucket, Rhode Island police detective working as a DEA TFA in that state. Hall rested on her cross-examinations of TFAs Gardner and Smith and documents she introduced into evidence.

Hall became of interest to the DEA during its investigation of Mr. Dunn. In July 2011, a source of information ("SOI") told the DEA that Dunn was transporting heroin from Rhode Island on a weekly basis to sell in Essex Junction, Vermont. According to the SOI, Dunn usually drove a gold Lexus when making supply runs to the Essex Junction location. The DEA sought to verify the SOI's tip by calling the Burlington Police Department ("BPD"). BPD had two confidential sources ("CSs") of its own who were knowledgeable of Dunn's activities and corroborated the SOI's description of Dunn's once-weekly trips. At least one CS had informed BPD that Dunn typically deposited heroin at a location in Burlington, on King Street. The two also noted that it was Dunn's associates, including a woman named Amanda Sprano and an individual named "Spooner," not Dunn himself, who handled sales of the drugs once they reached Vermont. One CS corroborated the SOI's description of a gold Lexus, indicating that Dunn and Sprano often used the car in their drug trade. A search of Dunn's criminal history revealed he was on supervised release for a federal conviction for being a felon in possession of a

firearm and had a prior a state conviction for dealing drugs.
On July 26, 2011, the DEA relied on that information to obtain a warrant to track the location of Dunn's cell phone via GPS, which it successfully renewed on September 8. The application for the renewed warrant contained the report of a third CS ("CS 3"), who had observed Dunn with drugs, noted that Dunn stayed with Sprano when visiting Vermont, and stated that Sprano sold drugs for Dunn. No source reported that anyone other than Sprano or Dunn was involved in transporting drugs to Vermont. With the exception of one week in the more than seven the DEA monitored Dunn's phone location, Dunn adhered to the anticipated once-weekly travel pattern.

At around 1:00 am on September 10, TFA Gardner received notice that Dunn's cell phone had left Rhode Island and was moving toward Vermont. In the thin 5 am traffic, Gardner and other agents surveyed the northbound lanes of Interstate 89 from a rest area outside of the city. Gardner noticed a red Dodge Charger pass his location. The Charger, as later determined by Gardner's colleague TFA Justin Couture, was a rental car on loan to a woman named Kayla Savard. Savard was the same person to whom Dunn's cell phone was registered. Several minutes later, a gold Lexus matching the SOI and CSs' descriptions drove past. Gardner pulled out and followed the Lexus as it travelled toward

3

Burlington.  Running a check on the vehicle's license plate number, Gardner determined it was registered to Amanda Sprano. Pulling alongside the car at a stoplight, Gardner noted the driver was a light-skinned black woman whom he had not seen before.

Meanwhile, TFA Couture was waiting near the King Street address and radioed Gardner that a red Dodge Charger had parked nearby.  Soon, the Lexus also arrived at King Street, parking near the Charger.  Couture observed people from the two cars walk toward the King Street building, including Dunn.  CS 3 later confirmed that Dunn had been in the area at around the same time selling drugs.  Less than eight hours after Dunn arrived, the GPS monitor showed his phone leaving Burlington to return south.

While the gold Lexus was parked at King Street, agents covertly installed a GPS tracking device on it.  They did not obtain a warrant.  The device informed them that on September 12, the Lexus began heading south on Interstate 89.  Gardner positioned himself on the highway to monitor the vehicle, and eventually saw the Lexus travelling toward Rhode Island with the same light-skinned black woman driving.

After the sighting, TFA Gardner contacted colleagues in Rhode Island, requesting more information about the unidentified

woman he had seen.  TFA Smith fielded the request and established surveillance on the Lexus, which he had since seen parked at Dunn's residence in Pawtucket, Rhode Island.  Smith followed as a woman matching Gardner's description drove the Lexus to a gated housing project in Pawtucket.  After the woman entered the project, Smith discovered her name was Britney Hall by questioning the project's head of security.  Sometime before September 17, Smith phoned Gardner to relay his findings, and he followed up with e-mails containing photos he had taken of Hall during the surveillance.  Several of the photos are of Hall at Dunn's residence, including one of her, Dunn, and Sprano together.  Smith also reported that Hall visited a building in Pawtucket known for its involvement in heroin distribution. Gardner testified that on seeing the photos of Hall, he knew she was the same woman he saw driving the gold Lexus in Vermont.  On September 16, Smith phoned Gardner to report he had seen Dunn driving a GMC Yukon with Rhode Island plates, with Hall following in the Lexus.

At around 2:30 am on September 17, the GPS monitor on Dunn's cell phone revealed the phone was in Massachusetts and heading north.  Since the GPS tracker on the gold Lexus did not indicate the car had moved, Gardner believed Dunn was on his way to Vermont and likely driving a different car.  Intending to

arrest Dunn that day, Gardner drove to New Hampshire to stake out a toll plaza through which Dunn would be required to pass. He eventually spotted a Yukon matching Smith's description, and discovered that it too was registered to Kayla Savard. Gardner followed the vehicle as it made its way toward and onto Interstate 89 in the direction of Vermont. While Gardner was driving alongside, a passenger in the Yukon turned on an interior light. The light enabled Gardner to identify the driver at the time as Dunn. Once the Yukon reached the outskirts of Burlington, just after dawn, agents were able to determine that Hall had taken the wheel. Gardner surmised that Hall and Dunn had traded places when they paused at a rest area in New Hampshire.

The Yukon eventually exited Interstate 89, merged onto Interstate 189, and took an off ramp for Route 7 in South Burlington. At that point, six or seven unmarked vehicles were trailing it in otherwise light early morning traffic. Rather than make a right turn onto Route 7, which would have positioned the Yukon to head north to King Street in downtown Burlington, Hall drove straight through the intersection and into a strip mall parking lot. Gardner followed and confirmed that Dunn was in the car, in the passenger seat. Without pausing, the Yukon slowly circled in the lot, and turned in the anticipated

northerly direction onto Route 7.  Gardner interpreted the detour as an evasive driving tactic to confirm the Yukon was being followed.  While driving on Route 7, the Yukon made what Gardner described as nervous movements within its lane.  It soon took a sudden left turn onto a small street, Beech Street, well south of King Street.  It pulled alongside the curb on the left side of the road, behind a parked car, and stopped.

The six or seven pursuit vehicles all followed onto Beech Street and parked so as to surround the immobile Yukon. Gardner, Couture, and another agent moved toward it with guns drawn and wearing bulletproof vests emblazoned with "DEA" and "Police."  Surrounding the vehicle, they ordered Hall and Dunn to exit.  As they approached, they noticed nervous movements from inside.  Gardner knocked on the driver's side window and attempted to open the car's doors, which were locked.  He testified that it was possible that another agent told Dunn and Hall that if they did not exit, the agents would break the Yukon's windows.  Hall opened the door, and Gardner and Couture held her and guided her outside.  As Hall exited, Gardner observed that her pants were unbuttoned.  Agents immediately frisked and handcuffed Hall and took her to a BPD station for questioning.  There, she waived her *Miranda* rights.  She admitted that she had begun the trip carrying crack cocaine and

7

heroin underneath her bra.  Just before bringing the Yukon to a stop on Beech Street, however, she said Dunn had told her to hide the drugs in her vagina.  After performing a cavity search, the agents recovered a concealed package of heroin and cocaine.

## Discussion

The dispositive question is whether probable cause supported Hall's arrest on Beech Street, permitting agents to transport her to the BPD station for questioning.  Before reaching that issue, however, Hall argues Gardner's suppression hearing testimony lacked crediblity, at least as far as it asserted that Gardner made a pre-arrest connection between Hall and the light-skinned black woman driving the Lexus on September 10.[1]

---

[1]  Another potential threshold issue is the installation of the GPS device without a warrant on the Lexus.  Warrantless GPS tracking of a suspect's vehicle is an emerging frontier in Fourth Amendment law.  *See generally United States v. Jones*, 132 S. Ct. 945 (2012).  Defense counsel initially signaled an interest to expand the motion to suppress to exclude any fruits of the GPS device, the use of which was first revealed on Gardner's direct examination at the suppression hearing.  However, defense counsel did not follow up by raising the issue in argument.  Perhaps this was because subsequent testimony showed that the GPS car monitor was of little value in this case.  The device allowed Gardner to confirm the light-skinned black woman left Vermont on September 12.  However, Smith's investigation independently found Hall and the Lexus in Rhode Island sometime between September 12 and 16.  The device also showed that the Lexus was left behind on Dunn and Hall's September 17 trip.  Even so, Gardner was already aware that Dunn

**I. Gardner's Credibility**

Hall argues that none of the documentary evidence introduced individually corroborates that, prior to the arrest, Gardner had determined the woman he first saw driving the gold Lexus in Vermont was her. Hall is correct that no document in the record alone outlines the full sequence of events that Gardner described before the Court. However, the written evidence is collectively consistent with Gardner's testimony. In a Report of Investigation focusing on the activities of September 10, Gardner noted spotting the gold Lexus and observing that its driver was "either an hispanic female or light skinned black female." Def.'s Hr'g Ex. A, at 19-20. While there are no copies of emails or notes of phone conversations between Gardner and Smith in the record, Smith provided extensive testimony on his surveillance efforts and communication with Gardner. Many of his photos of Hall were entered into the record. Gov't's Hr'g Exs. 1-12. In the Report of Investigation related to the September 17 arrest, Gardner notes having identified Hall and Dunn prior to the arrest, and

---

had been seen driving the Yukon and had previously used vehicles other than the Lexus to travel to Vermont, such as the rented Charger. The information the GPS device provided strikes the Court as irrelevant to the probable cause determination in this case, so it need not examine the constitutionality of installing the GPS device without a warrant here.

9

that Hall's identity had originally been confirmed by "Agents in R.I." Def.'s Hr'g Ex. B, at 92. He stated the same in his grand jury testimony. Def.'s Hr'g Ex. F, at 82.

The only potential inconsistency is in the criminal complaint Gardner swore on September 17 in support of an arrest warrant for Dunn. Def.'s Hr'g Ex. J. The complaint mentions identifying Hall as the Yukon's driver only after it discusses the facts of the Beech Street arrest. *Id.* at 3. It thus might appear the agents did not know who Hall was until they brought her to the BPD office. However, the complaint does specify that "Rhode Island agents had previously identified Hall as an associate of Dunn's." *Id.* In addition, the purpose of the complaint was to secure Dunn's arrest, and it only discusses Hall at all in the context of post-arrest statements she made that incriminated him and the drugs found on her person. *See id.* at 1, 3-4. The Court finds Gardner credible in his suppression hearing testimony. The written evidence, while not comprehensive, supports his courtroom account, as does the testimony offered by TFA Smith.

**II. Probable Cause**

The burden of proving probable cause for Hall's arrest is the government's. *United States v. Campbell*, 790 F. Supp. 2d 166, 175 (D. Vt. 2011). "Probable cause exists where, 'at the

moment the arrest was made, . . . the facts and circumstances within the [ ] [officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" *Id.* (alterations in original) (quoting *Beck v. Ohio,* 379 U.S. 89, 91 (1964)). Since the analysis focuses on the information available at the time of the arrest, it is preliminarily important to establish at what point the arrest occurred. *See Rios v. United States*, 364 U.S. 253, 261-62 (1960).

   A. Timing of the Arrest

Hall argues she was under arrest when Gardner and his fellow agents approached the Yukon and ordered her to exit. That may render her unbuttoned pants, which Gardner noticed after Hall left the vehicle, irrelevant to determining probable cause. The government does not address the issue, but implies that the arrest began after Hall left the car and Gardner had already observed her clothing.

The Second Circuit has rejected applying a per se rule that officers blocking a defendant's car with police cruisers and approaching with guns drawn is an arrest rather than a *Terry* stop. *United States v. Garcia*, 339 F.3d 116, 119 (2d Cir. 2003). The Court considers the threat to officers or

bystanders, *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990), balanced against the level of intrusion on the defendant, which can be evidenced by the number of law enforcement and vehicles involved, whether officers drew their guns, and whether the action had the effect of totally preventing the defendant's car's movement, *United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982).

The facts here closely resemble those in *United States v. Ceballos*, 654 F.2d 177 (2d Cir. 1981), a case in which the Second Circuit found an arrest prior to the defendant leaving his vehicle. Officers used at least three cars to block Ceballos, a drug suspect, when he brought his car to a stop at a red light. *Id.* at 179-80. At least some of the officers had their guns drawn when they subsequently approached the car and ordered him to exit. *Id.* at 180 & n.3. While the Circuit agreed that "that narcotics traffickers are often armed and violent," it made clear that "that generalization, without more, is insufficient to justify the extensive intrusion which occurred in this case." *Id.* at 184. The generalization did not apply in part because officers did not believe Ceballos was a major drug trafficker, Ceballos did not drive dangerously or evasively, and he did not appear to be armed. *Id.* As such, Ceballos "was arrested at the moment the progress of his car was

blocked and he was faced by the officers with their guns drawn and ordered out of his car." *Id.; see also Campbell*, 790 F. Supp. 2d at 173-74 (finding an arrest where an officer ordered a defendant out of a vehicle at gunpoint).

Here, the encounter involved two suspected drug traffickers, one of whom, Hall, had driven evasively. Dunn had a prior conviction for possessing a firearm as a convicted felon. However, there were no further indications that either person was armed and dangerous at the time of the arrest. Hall did not drive recklessly or seek to escape when the agents pinned the Yukon on Beech Street. *Cf. United States v. Harley*, 682 F.2d 398, 400-02 (2d Cir. 1982) (finding blocking defendant's car and displaying firearms was permissible as part of a *Terry* stop when the defendant ignored a command to stop, ran a red light, and engaged officers in high speed chase); *Alexander*, 907 F.2d at 273 (finding no arrest when agents stopped a car and approached with guns unholstered, where the suspects had appeared to make a large drug purchase, had been speeding, driving through red lights and evading surveillance, and the stop occurred amidst innocent bystanders); *Campbell*, 790 F. Supp. 2d at 175 (finding the fact that the defendant was lying the trunk area of a car with eyes closed, which the officer interpreted as an effort to evade detection, was not

13

alone indicative of dangerousness).  Meanwhile, six or seven law
enforcement vehicles surrounded the car and agents approached it
with weapons deployed.  They ordered Hall and Dunn to exit,
knocked on the windows, attempted to open the doors, and
possibly threatened to shatter the windows.  Under that record,
the Court finds Hall was seized to the point of an arrest even
before she complied with the order to leave the vehicle and
Gardner saw that her pants were suspiciously unbuttoned.[2]

    B. Probable Cause Analysis

Hall maintains the agents lacked probable cause sufficient
to arrest her.  Probable cause must be "particularized with
respect to the person to be searched or seized." *Maryland v.
Pringle*, 540 U.S. 366, 371 (2003).  The government clearly

---

[2] The Court notes that one might well characterize the facts of this type of seizure differently.  Take, for instance, if beforehand the agents had probable cause to arrest Dunn, but only reasonable suspicion as to Hall.  In that event, they might be justified in surrounding the vehicle and forcing Dunn to exit in the same manner chosen here while making clear to Hall that she was only going to be questioned briefly to determine her involvement and subjected to a protective frisk.  Upon questioning Hall and noticing her unbuttoned pants, the officers might then have argued they had probable cause to arrest her.  In that case, the opened pants would indeed be an integral part of the Court's probable cause analysis.  Since the Court, below, finds the agents had probable cause to arrest Hall even before surrounding the Yukon on Beech Street, it need not discuss further this or other scenarios under which her pants could have been relevant.

cannot base probable cause on a mere association between the defendant and the prime target of a criminal investigation. *See Ybarra v. Illinois*, 444 U.S. 85, 90-91 (1979); *Sibron v. New York*, 392 U.S. 40, 62 (1968); *United States v. Di Re*, 332 U.S. 581, 593-94 (1948). If the evidence otherwise singles out a person other than the defendant, "[a]ny inference that everyone on the scene of a crime is a party to it must disappear." *Di Re*, 332 U.S. at 594. Where the criminal activity takes place exposed to public scrutiny and involves conduct that is not outwardly criminal, "[t]he argument that one who accompanies a criminal to a crime rendezvous cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched." *Id.* at 593 (internal quotation marks omitted).

Still, an inference of criminal collusion is permissible to support probable cause when officers have a basis to believe in a preexisting criminal relationship between the target and a second person of interest. *United States v. Patrick*, 899 F.2d 169, 171-72 (2d Cir. 1990) (finding probable cause to arrest Patrick when officers found cocaine in Taylor's purse and when Patrick carried a knapsack, crossed the international border just after Taylor, and had provided customs inspectors with the same suspicious back story as Taylor).

In *Maryland v. Pringle*, the Supreme Court found probable

15

cause to arrest all three occupants of a car on the basis of discovering money and drugs that none of the three claimed as his own. 540 U.S. at 367-68. The Court first explained that "'a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.'" *Id.* at 373 (quoting *Wyoming v. Houghton,* 526 U.S. 295, 304-05 (1999)). The discovery of drugs and cash in the car "indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." *Id.* It was not the case that the evidence singled out a culprit other than the defendant. *Id.* at 374. Similarly, the Second Circuit found probable cause to arrest Rodriguez for driving Delossantos to his prearranged transaction with an undercover DEA agent. *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008). Applying *Pringle*, the Court noted that since Delossantos had become suspicious about the law enforcement ties of his potential customer, he "was unlikely to be accompanied by an innocent person . . . and thus had reason to worry about the prospect of a witness against him." *Id.* Even though the officers had no other specific information about Rodriguez, "[t]here was no . . .

16

. singling out of Delossantos but not Rodriguez." *Id.* at 160 & n.3.

In this case, the investigation centered on Dunn. Gardner admitted that on the morning of September 17 he was planning to arrest Dunn specifically. There was no strong reason to anticipate that Hall would be joining Dunn, nor any direct evidence that Hall had ever transported drugs. No informant had ever mentioned Hall. Those factors make this a difficult case, but the agents nonetheless had substantial grounds to believe that Dunn and Hall's travel was related to drug dealing and that Hall was an active participant. For one, the SOI and CS descriptions painted a picture of Dunn's weekly trips to supply drugs in Vermont that was largely corroborated by each other's accounts and by the agents' surveillance. Because the descriptions and predictions of the SOI and CSs proved almost entirely accurate, the DEA was entitled to rely upon them in forming probable cause. *See Illinois v. Gates*, 462 U.S. 213, 233 (1983); *Draper v. United States*, 358 U.S. 307, 313-14 (1959).

Most concretely, Gardner identified a woman of Hall's description driving the gold Lexus, Dunn's reported drug smuggling vehicle of choice, on September 10. The Lexus met with the Charger carrying Dunn near the King Street address.

17

During that same time period, CS 3 reported that Dunn had sold drugs. Within several days, Hall and the gold Lexus were once again in Rhode Island. Gardner asked Smith to investigate who the woman was, and Smith's findings confirmed that the woman was Hall. Smith also noted Hall had visited a house involved in drug dealing and photographed her meeting with Sprano and Dunn at Dunn's home. Finally, Smith noted that Hall had followed Dunn when he drove the Yukon the day before the trip to Vermont. The DEA did not simply single out Dunn. Rather, it made considerable efforts to identify and investigate Hall and, before the day of the arrest, possessed information linking her to Dunn's drug operations.

On September 17, Dunn and Hall's travel to Vermont added further grounds for probable cause. The pair's early morning itinerary matched closely their pre-dawn travel on September 10. Hall and Dunn were once again headed in the direction of the King Street address. When they recognized police surveillance, Hall engaged in evasive driving. *See United States v. Soto*, 375 F.3d 1219, 1222-23 (10th Cir. 2004) (finding the fact that the defendant, in a separate vehicle from the target of the drug investigation, engaged in counter-surveillance maneuvers and then followed the target's truck toward the site of a scheduled drug transaction gave rise to probable cause); *United States v.*

18

*Ceballos*, 719 F. Supp. 119, 125 (E.D.N.Y. 1989) (Weinstein, J.) ("Evasive driving is another indicia of suspicion of drug trafficking."). Those factors, viewed together, amount to probable cause to arrest Hall before the agents ordered her out of the Yukon. Hall's motion to suppress is therefore denied.

Dated at Burlington, in the District of Vermont, this 7th day of August, 2012.

<pre>                                    /s/William K. Sessions III
                                    William K. Sessions III
                                    U.S. District Court Judge</pre>